UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE No.: 9-19-CV-80111-BLOOM/Reinhart

CENTRE HILL COURTS
CONDOMINIUM ASSOCIATION, INC.

    Plaintiff,

vs.

ROCKHILL INSURANCE COMPANY,

    Defendant.
_____/

**PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DEFENDANT'S EXPERT WITNESSES ANDRE SLINTAK, P.E., AND ARTHUR ASHWORTH, P.E.**

Plaintiff CENTRE HILL COURTS CONDOMINIUM ASSOCIATION, INC., by and through undersigned counsel, pursuant to Federal Rule of Evidence 702, Federal Rule of Civil Procedure 37 and this Court's Amended Scheduling Order dated October 22, 2019 [D.E. 58], files this *Daubert* Motion to Exclude the Opinions of Defendant's Expert Witnesses Andre Slintak, P.E., and Arthur Ashworth, P.E., and in support thereof states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

1. This action arises from Plaintiff's first-party property insurance claim for the physical damages suffered to its property due to wind as a result of Hurricane Irma, and a breach of contract action filed by Plaintiff on or about October 17, 2018, in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. [D.E 10].

2. On February 1, 2019, Defendant filed its Answer and Affirmative Defenses to Plaintiff's First Amended Complaint alleging eight (8) affirmative defenses. [D.E. 11 at 15-21].

1

3.     On February 20, 2019, the Court entered an Order Setting Trial and Pre-Trial Schedule, Requiring Mediation, and Referring Certain Matters to Magistrate Judge ("Scheduling Order"), setting the matter for two-week trial beginning on February 18, 2020 and setting commensurate deadlines. [D.E. 17.].

4.     The Court's Scheduling Order originally set forth a deadline of October 22, 2019 to complete all discovery (including expert discovery). [D.E. 17.]

5.     On September 24, 2019, Defendant served its Expert Witness Disclosures and disclosed three (3) testifying experts: Arthur Ashworth, P.E., Andre Slintak, P.E. and Andrew Young.[1]

6.     Defendant's Expert Witness Disclosures disclose that Mr. Ashworth and Mr. Slintak intend to testify at trial regarding the opinions set forth in the Madsen & Kneppers & Associates, Inc. written report dated January 9, 2018 (the "2018 Report"):

> 1. **Ashworth, Arthur, P.E.**
> **Madsen, Kneppers & Associates, Inc.**
> **5600 Greenwood Plaza Blvd., Suite 300**
> **Foxborough, Massachusetts, 02035**
> Mr. Arthur Ashworth is a licensed engineer in the State of Colorado and was retained by Rockhill to inspect the subject property. Mr. Ashworth's qualifications and case list are set forth in his Curriculum Vitae which will furnished hereafter. *Madsen, Kneppers & Associates, Inc.'s ("MKA") report is attached hereto as **Exhibit "1."*** MKA's Fee Schedule is attached hereto as ***Exhibit "2"***. Mr. Ashworth reviewed the documents of record, available weather data, historical aerial images, and conducted an inspection of the Insured Property on November 14 and December 8, 2017.
>
> 2. **Slintak, Andre, P.E.**
> **Madsen, Kneppers & Associates, Inc.**
> **5600 Greenwood Plaza Blvd., Suite 300**
> **Foxborough, Massachusetts, 02035**
> Mr. Slintak is licensed engineer in the State of Florida who reviewed the findings in this matter, performed a re-inspection of the subject property and approved the MKA report. *MKA's report is attached hereto as **Exhibit "1."*** MKA's Fee Schedule is attached hereto as ***Exhibit "2"***. Mr. Slintak reviewed the

---

[1] A copy is being filed contemporaneously with this motion.

documents of record, available weather data, historical aerial images, and conducted a re-inspection of the Insured Property on August 2, 2019. *Mr. Slintak's Curriculum Vitae is attached hereto as* **Exhibit "3."**

A copy of the 2018 Report is attached to Defendant's Expert Witness Disclosures.

7. On October 8, 2019, Defendant served its Rebuttal Expert Disclosures, listing experts Andrew Slintak, P.E. and Andrew Peters.[2]

8. Defendant's Rebuttal Expert Disclosures disclose, as to Mr. Slintak, a written rebuttal report dated October 7, 2019 (the "2019 Report"). A copy of the 2019 Report is attached to Defendant's Rebuttal Expert Disclosures.

9. On October 22, 2019, the Court entered an Amending Scheduling Order, ECF No. [17], and Certain Pre-Trial Deadlines. [D.E. 58] ("Amended Scheduling Order") and ordered the following deadlines:

| | |
|---|---|
| **November 27, 2019** | All discovery, including expert discovery, is completed. |
| **December 9, 2019** | All pre-trial motions, motions *in limine*, and *Daubert* motions (which include motions to strike experts) are filed. **This deadline includes all dispositive motions.** Each party is limited to filing one motion *in limine* and one Daubert motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, leave to exceed the page limit will be granted. **The parties are reminded that motions *in limine* must contain the Local Rule 7.1(a)(3) certification.** |
| **February 3, 2020** | Parties submit joint pre-trial stipulation in accordance with Local Rule 16.1(e), proposed jury instructions and verdict form, or proposed findings of fact and conclusions of law, as applicable. |

10. On November 27, 2019, the Court entered an Order that all discovery, including expert discovery, must be completed by December 6, 2019. [D.E. 61].

11. This matter is set for trial during the Court's two-week trial calendar beginning on February 18, 2020. [D.E. 17.]

---

[2] A copy is being filed contemporaneously with this motion.

**MEMORANDUM OF LAW**

Plaintiff requests that the Court enter an order prohibiting Defendant's experts, Andre Slintak, P.E., and Arthur Ashworth, P.E., from testifying at trial.

First, Plaintiff requests the Court enter an order prohibiting Mr. Slintak and Mr. Ashworth from testifying at trial on certain opinions regarding meteorological data or conditions, and causation opinions. Under the *Daubert* standard for admission of an expert testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), adopted in the Florida Rules of Evidence, Mr. Slintak and Mr. Ashworth should not be permitted to provide testimony on an area of expertise in which they are not qualified and that is not sufficiently reliable.

Second, Plaintiff requests the Court enter an order prohibiting Mr. Slintak from testifying at trial on any opinions because his opinions are premised on incorrect methodology and in inappropriate damage investigation, and his opinions are unreliable.

**I. Mr. Slintak's Proposed Opinions**

On September 24, 2019, Defendant named its expert witnesses and their areas of testimony. Defendant named both Andre Slintak, P.E. and Arthur Ashworth, P.E. of Madsen Kneppers & Associates ("MKA") to offer causation testimony at trial based on the 2018 Report. Notably, Defendant did not name any meteorologist to offer expert testimony on forensic meteorology, and regarding the wind speeds or gusts that occurred at the Plaintiff's property on the date of loss in question, or regarding any rebuttal opinions with respect to any meteorological testimony offered by Plaintiff's meteorologist expert, Rocco Calaci.

Based on Defendant's Expert Disclosures, it is anticipated that Mr. Slintak will provide his opinion regarding causation of the damages to Plaintiff's property as a result of Hurricane Irma on September 10, 2017. It is also anticipated that Defendant will illicit improper testimony

4

from Mr. Slintak regarding meteorological data and conditions associated with Hurricane Irma. Mr. Slintak was deposed by Plaintiff's counsel on December 6, 2019[3], and he was questioned about the opinions he has regarding this case. During his deposition, he testified to the following:

- He received his Bachelor of Engineering degree in Naval Architecture from the State University of New York Maritime College in 1994, and his Master of Science degree in Civil Engineering from Florida Atlantic University in 2004. P. 27:20-22; and see Curriculum Vitae of Andre Slintak attached as **Exhibit "B"** produced by Defendant in this case.

- He was retained to determine causation of moisture into the interior of the units through the roof and the causation of roof damage at Plaintiff's property. P. 40:13- 41:2.

- MKA was hired to determine the cause and origin of water intrusion at Plaintiff's property. P. 96:7-16; 103:14-17.

- He did not consult with any meteorologists in this matter. P. 65:9-14.

- He did not have any discussions with any meteorologists prior to issuing the 2018 Report in this matter. P. 65:15-18.

- He did not have any discussions with any meteorologists prior to issuing the 2019 Report in this matter. P. 65:19-22.

- He is not a professional meteorologist. P. 64:21-22.

- He has no formal specialized training in meteorology other than one certificate he obtained from a course taken as part of his undergraduate degree. P. 64:22-65: 5.

- He was not aware of any meteorologist retained by Defendant in this litigation. P. 65:23-25.

- He provided weather data within his 2018 Report. P. 66:1-3.

- He has formulated opinions regarding the weather conditions at the Plaintiff's property on the date of loss. P. 66:11-14.

- His opinions related to weather on the date of loss are that there were elevated winds recorded. P. 66:19-23.

---

[3] A copy of Mr. Slintak's deposition transcript is being filed contemporaneously with this motion.

- Exhibit B to the 2018 Report has a representation of what those estimated winds are based on, the services MKA obtained from Compuweather, a forensic meteorology firm. P. 66:19-67:10.

- Compuweather was not consulted directly for this case. P. 67:2-3.

- His opinions also include his review of Rocco Calaci (Plaintiff's meteorological expert) report and his review of the National Weather Service's Hurricane Irma Tropical Cyclone Report. P. 66:19-67:10.

- He has formulated opinions regarding the weather conditions at Plaintiff's property on the date of loss in both the 2018 Report and the 2019 report that he has issued in this matter. P. 67:22-68:1.

- Arthur Ashworth would have also analyzed the weather data that Mr. Slintak cited in the 2018 Report. P. 68:2-13.

- He did not know if Arthur Ashworth would be giving testimony in this matter regarding weather conditions on the date of loss at the Plaintiff's property. P. 68:14-17.

- He doesn't know if Arthur Ashworth is a meteorologist or whether Arthur Ashworth has any formal meteorological training. P. 68:18-22.

- He has opinions in rebuttal to the opinions of Rocco Calaci (Plaintiff's meteorological expert):

    Q. Do you agree with Rocco [Calaci's] opinions in his
    expert report that you've attached to your October 2019
    report?

    A. I agree with portions of it, yeah.

    Q. Okay. If you could take a look at his report
    there and let me know which portions of you agree with.

    A. I agree with the portion where he says that the
    NWS, the National Weather Service, which is a division of
    NOAA, is the authoritative source meteorological
    information.

    Q. Okay. Anything else that you agree with?

    A. I agree that there were elevated winds recorded
    in the vicinity of the subject location on the date of
    loss. I agree that there were tornadic activity recorded

more than 20 miles away from the subject location.

Q. Anything else you agree with?

A. I think that's it.

Q. Is there any reason that you would disputes Rocco [Calaci's] opinions in this matter?

A. Yes.

Q. Okay. Why?

A. Based on my review of archival information from the National Weather Service as it relates specifically to the tropical cyclone report for the Hurricane Irma, the National Weather Service, which is the authoritative source for weather information as Mr. [Calaci] agrees, stated that there was no documented tornadic activity on or around -- immediately around the site of the subject location.

Q. Did Rocco [Calaci] identify winds strong enough to damage the roof systems at the property?

A. There were elevated winds which could -- could potentially cause damage, yes.

Q. Do you have any reason to dispute Mr. [Calaci] opinions regarding wind speeds or wind gusts?

A. No. His reports of wind speeds and wind gusts are in line with what CompuWeather had estimated in Exhibit B of my January report.

Q. How much did MKA pay CompuWeather for the information that you obtained?

A. I don't have that information. It's procured at a company level not at our local office so I don't have that information.

P. 68:23-70:15.

- He relied on his own analysis of weather data:

> Q. Is it your opinion as a nonmeteorologist that you can rely on your own analysis of weather data rather than a meteorologist such as one retained by the plaintiff?
>
> A. I relied on the tropical cyclone report from the National Weather Service which Mr. [Calaci] verified and I agree with that is the authoritative source for weather information. And so the report that was in the tropical cyclone report issued by the National Weather Service helped me to form my opinions about the matter.

P. 97:11-19.

- He has inspected only approximately eighty roofs throughout his career. P. 28:19-29:11.

- A moisture survey is conducted on the surface of a roof and is not conducted inside of a building. P. 101:22-102:1.

- A moisture survey would also provide data that would tell you if there is moisture in the membrane of the roof. P. 103:8-13.

- A moisture survey is a useful tool in establishing the baseline condition of a roof to recommend the proper repair. P. 40:6-9.

- A moisture survey can be useful in determining the causes of roof problems and their solutions. P. 40:2-5.

- A moisture survey addresses the condition of the roof. P. 33:19-34:6.

- He did not discuss with the other MKA engineer, Arthur Ashworth, regarding conducting a moisture survey. P.45:15-46:16.

- He was not prevented from doing anything in regard to his investigation in this matter. P.100:18-23.

- An expert witness should not contradict other experts who are outside his depth who are better situated to give accurate testimony. P. 8:11-17.

- He has only performed a moisture survey twelve times in his career, and those were all during the scope of his employment as an engineer at MKA, and all involved Hurricane Irma cases. P. 32:2-15.

**II. Mr. Ashworth's Proposed Opinions**

On September 24, 2019, Defendant named its expert witnesses and their areas of testimony. Defendant named both Arthur Ashworth, P.E. and Andre Slintak, P.E. of MKA to offer causation testimony at trial. Defendant did not name any meteorologist to offer expert testimony on forensic meteorology, and regarding the wind speeds or gusts that occurred at the property on the date of loss in question, or regarding any rebuttal opinions with respect to any meteorological testimony offered by Plaintiff's meteorologist expert, Rocco Calaci.

It is anticipated that Mr. Ashworth will provide his opinion regarding causation of the damages to Plaintiff's property as a result of Hurricane Irma on September 10, 2017. It is also anticipated that Defendant may illicit improper testimony from Mr. Ashworth regarding meteorological data and conditions associated with Hurricane Irma. Mr. Ashworth was deposed by Plaintiff's counsel on November 7, 2019, and he was questioned about the opinions he has regarding this case.[4] During his deposition, he testified to the following:

- He has an undergraduate degree, bachelor of science in engineering, from Colorado School of Mines. P. 20:3-8.

- He is not a professional meteorologist. P. 49:11-12.

- He has not taken any courses in meteorology. P. 49:13-14.

- He has no formal training in meteorology. P. 49:16-18.

- He did not have any discussions with any meteorologist before issuing the 2018 Report. P. 50:2:24.

- He is not aware of any meteorologist retained by Defendant for this litigation. P. 50:25-51:2.

- Mr. Ashworth did not perform a moisture survey and did not order any type of moisture survey to be completed. P. 56:8-11; 88:23-25.

---

[4] A copy of Mr. Ashworth's deposition transcript is being filed contemporaneously with this motion.

- During Mr. Ashworth's time of employment at MKA, to his knowledge, no one from MKA or Defendant or any of Defendant's retained experts performed a moisture survey. P. at 89:1-6.

- There were no parameters or restrictions put on the scope of his investigation other than what was listed in the project information sheet that MKA had in its file. P. 53:14-25; see also Exhibit 6 to Ashworth Dep.

### III. Legal Standard for a *Daubert* Challenge

Federal Rule of Evidence 702 provides, "[a] witness who is qualified as an expert by knowledge, skills, experience, training, or education may testify in the form of an opinion or otherwise if: the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case."

Courts must serve "as a gatekeeper to keep out irrelevant or unreliable expert testimony." *U.S. v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (cit*ing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993)). This gatekeeping function under *Daubert* "'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards of admissibility under Rule 702." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original).

The Eleventh Circuit has established a three-part test to determine the admissibility of expert testimony under Rule 702. Specifically, trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert, and (3) the testimony assists the trier of fact, through the application of scientific,

> technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260. The burden of establishing the proposed expert's qualification, reliability and helpfulness rests on the proponent of the expert opinion. *Id*. at 1261. See also *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); Fed. R. Evid. 702, advisory committee's note (2000 Amendments) ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

Furthermore, the proffered expert must identify the principles and methods supporting her opinion. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). The expert cannot provide a "bottom line" conclusion without explaining the basis for it. *Id*. (quoting *Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.*, 521 F.3d 790, 721 (7th Cir. 2008) (*per curiam*)); see also Fed. R. Civ. P. 26(a)(2)(B) (requiring parties to disclose "a complete statement of all opinions the [testifying] witness will express *and the basis and reasons for them*" (emphasis added)).

### IV. Andre Slintak, P.E. is not a meteorologist; and as such is not qualified to render opinions outside his area of expertise, including weather or meteorological conditions at the Plaintiff's property.

Mr. Slintak's expertise and opinions on weather or meteorological conditions fail the tests for scientific reliability prescribed by the Rules of Evidence and also the first prong of the *Daubert* standard, which states the expert must be qualified to testify competently on the matters he intends to address. Mr. Slintak is a licensed engineer in the State of Florida, who prepared two written reports regarding causation of damage to the Plaintiff's property. Mr. Slintak should be precluded from giving expert testimony regarding any weather or meteorological conditions at the Plaintiff's property which is outside his area of expertise and would create the danger of improperly influencing and confusing the jury. As admitted in his deposition, Mr. Slintak is not a professional meteorologist and has no formal specialized training in meteorology other than one

course he took in college. Slintak Dep. at 64:22-65:5. Also, in developing his opinion, Mr. Slintak failed to consult with any meteorologist retained by Defendant and admitted he was not aware of any meteorologist retained by Defendant. *Id.* at 65:23-25. In fact, Mr. Slintak failed to consult with *any* meteorologists in developing his opinions. *Id*. at 65:9-22.

Mr. Slintak testified that he formulated opinions regarding the weather conditions at the Plaintiff's property on the date of loss, and these opinions are contained in the 2018 Report and the 2019 Report. *Id.* at 66:11-14; 67:22-68:1. Mr. Slintak chose not to speak with any meteorologists in this matter and instead purports to express "expert" opinions based upon on his own research on meteorological conditions. He admits that he is not a meteorologist, however he testified he has formulated opinions in rebuttal to the opinions of Plaintiff's meteorologist expert, Rocco Calaci. Mr. Slintak has not provided any credible evidence of his ability to collect, interpret or analyze meteorological data. Mr. Slintak has never been tested on his meteorological knowledge or competence in any manner for meteorology. Accordingly, Mr. Slintak's opinions regarding any meteorological data or conditions are not based upon specialized knowledge, he is not qualified to testify as to such opinions and his opinions are therefore unreliable.

> **V.    Arthur Ashworth, P.E. is not a meteorologist; and as such is not qualified to render opinions outside his area of expertise, including weather or meteorological conditions at the Plaintiff's property.**

For similar reasons as explained above as to Mr. Slintak, to the extent that Mr. Ashworth has any opinions regarding metrological date or conditions, they are not based upon specialized knowledge, he is not qualified to testify as to such opinions and the opinions are therefore unreliable.

> **VI.   Mr. Slintak's causation opinions are premised on incorrect methodology and an inappropriate damage investigation, and accordingly, his opinions are not reliable.**

Plaintiffs contend that the roofs at the property were damaged by Hurricane Irma on September 10, 2017, which also caused interior damages to the condominium units. In opposition, Defendant retained Mr. Slintak to offer opinions regarding the cause of the damage to the roofs and interiors condominium units. MKA was retained by Defendant's independent adjuster, Engle Martin & Associates, to assist in determining if the roofs at Plaintiff's property sustained physical damage from a covered cause of loss and comment on the cause and origin of the water intrusion. Slintak Dep. at 91:8-92:3; 103:15-17. Mr. Slintak opined that the roofs were not damaged by Hurricane Irma.

In this case, Mr. Slintak's opinions are simply not reliable. Instead, Mr. Slintak's opinions are premised on conclusions reached by conducting an inappropriate damage investigation. A moisture survey is conducted on the surface of a roof and is not conducted inside of a building. *Id.* at 101:22-102:1. A moisture survey would also provide data that would tell you if there is moisture in the membrane of the roof. *Id.* at 103:8-13. Mr. Slintak also agrees that a moisture survey is a useful tool in establishing the baseline condition of a roof to recommend the proper repair. *Id.* at 40:6-9. Mr. Slintak also testified that a moisture survey can be useful in determining the causes of roof problems and their solutions. *Id.* at 40:2-5. Mr. Slintak agrees that a moisture survey addresses the condition of the roof. *Id.* at 33:19-34:6.

In this case, neither Mr. Slintak nor anyone else, performed a moisture survey as part of Defendant's investigation of Plaintiff's damages. Mr. Ashworth did not perform a moisture survey and did not order any type of moisture survey to be completed. Ashworth Dep. at 56:8-11; 88:23-25. During Mr. Ashworth's time of employment at MKA, to his knowledge, no one from MKA or Defendant or any of Defendant's retained experts performed a moisture survey. *Id.* at 89:1-6. Slintak did not discuss with the other MKA engineer, Arthur Ashworth, regarding

conducting a moisture survey. Slintak Dep. at 45:15-46:16.  Mr. Slintak testified that he was not prevented from doing anything in regard to his investigation in this matter. *Id.* at 100:18-23. Similarly, Arthur Ashworth testified there were no parameters or restrictions put on the scope of his investigation other than what was listed in the project information sheet that MKA had in its file. Ashworth Dep. at 53:14-25; see also Exhibit 6 to Ashworth Dep.

Mr. Slintak agrees that an expert witness should not contradict other experts who are outside his depth who are better situated to give accurate testimony. Slintak Dep. at 8:11-17. Mr. Slintak has only performed a moisture survey twelve times in his career, and those were all during the scope of his employment as an engineer at MKA, and all involved Hurricane Irma cases. *Id.* at 32:2-15. **Mr. Slintak has inspected only approximately eighty roofs throughout his career.** *Id.* at 28:19-29:11. **Plaintiff's expert, Steven Thomas of Roof Leak Detection Company, Inc., has personally evaluated over 20,000 roofing systems during his career**. See Transcript of Deposition of Steven Thomas ("Thomas Dep") taken on November 14, 2019; D.E. 65-1 at 223. His company is an approved Testing Laborator*y*. *Id.* In Hurricane Irma related cases alone, Mr. Thomas has performed approximately 500 moisture surveys to date. Thomas Dep., D.E. 65-1 at 71:13-22. Mr. Thomas testified that after looking at the Plaintiff's property, he recommended that he conduct a moisture survey of the flat roofs. *Id.* at 22:6-11. Mr. Thomas explained that a moisture survey is necessary when conducting a roof investigation on a flat roof because it provides a baseline condition of the roof. *Id.* at 22:6-14. Mr. Thomas performed a moisture survey with a Tramex Dec Scanner to determine whether there was any trapped moisture within the roofing assembly. *Id.* at 34:21-25. The Tramex Dec Scanner, generally used in the industry, is a device used along flat roofs, like an x-ray, and shows where there is trapped moisture underneath the roof. *Id.* at 35:1-9; 36:14-17. There are three different types of methodology for

14

performing moisture surveys: (1) using the Tramex Dec Scanner, (2) nuclear moisture surveys and (3) infrared moisture surveys. *Id*. at 36:14-22. The general methodology that Mr. Thomas uses in his investigations of flat roofs, such as the Plaintiff's roofs in this matter, is generally the same and he employs one of the three types of moisture surveys. *Id*. at 71:23-72:7. Mr. Thomas testified:

> . . . The, you know, we try to use a methodology that's systematic, meaning that we can do a complete investigation of the roof. Our initial evaluation is visual. We will go up and we'll look at the building or the roof and identify what type of roof it is and what type of testing that we could possibly do that's going to make a more informative conclusion on what we can do to that roof.
>
> We walk the roof in a gridded pattern so that we can see, you know, the entire roof. If it's possible to find the age of the roof, we try to do that. That's why we say if possible. Sometimes, it's not. We take photographs of conditions that we think are storm related or something that we see as recent in the way of damages.
>
> I identify other possible causes of damage: Wear and tear, poor insulation, lack of maintenance. Identify visual collateral damage to the rooftop pertinences. And then to perform a moisture survey.
>
> **And the moisture survey is establishing the baseline condition of the roofing system. And it's essential that we do that because any repairs or replacement recommendations, we need to know the condition of the roof. So in our flat roof assessments, we always do a moisture survey.**

D.E. 65-1 at 77: 6-78:7. Emphasis added.

Mr. Thomas has worked with MKA in the past and knows they have the ability to perform moisture surveys. *Id*. at 97:8-20. This is undisputed as Mr. Slintak also admitted that

15

MKA performs moisture surveys. Slintak Dep. at 94:5-95:4. Mr. Slintak agrees that when conducting a roof damage investigation an inspector should have the requisite experience to conduct the right test with the right equipment. *Id.* at 38:16-20. Notably, in this case, Mr. Slintak arrived at his expert opinions regarding the methodology of repair, based on assumptions, *i.e.*, without conducting a moisture survey to determine the condition of the roofs at the property. Mr. Slintak did not know the condition of the roofs before rendering his expert opinions in this matter. As a result, because Mr. Slintak's causation opinions that the damage to the roofs at the property are unrelated to Hurricane Irma are unreliable and based upon an incorrect damage investigation, Mr. Slintak should not be permitted to offer such opinions at trial, and they should be excluded.

**VII.    A *Daubert* style hearing is not necessary.**

Plaintiff acknowledges that a court can exclude the testimony of Defendant's experts, Arthur Ashworth, P.E., and Andre Slintak, P.E., because a formal *Daubert* hearing is not required in every case. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir.2001) ("Daubert hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." (quotation marks omitted)); *United States v. Kyler*, 429 F. App'x 828, 830 (11th Cir. 2011). Plaintiff suggests that it is plain from the cited reports and deposition testimony that Defendant's experts' testimony will be inadmissible, and the Court should exclude them on the bases explained above without the necessity of or a hearing on these issues. However, if this Court is disinclined to do so, Plaintiffs would request that a *Daubert* hearing be held, in advance of trial, to address these issues.

## CONCLUSION

As discussed above, Mr. Slintak and Mr. Ashworth's testimony regarding meteorological issues is improper for the following reasons. Mr. Slintak and Mr. Ashworth lack any demonstrable expertise in the field of meteorology. Mr. Slintak and Mr. Ashworth do not have the technical skills, knowledge and/or requisite background in order to opine as to weather data or meteorological conditions associated with Hurricane Irma on September 10, 2017. In other words, they are not qualified to offer meteorological opinions at trial. Such opinions would be outside of their area of expertise and, as such, are strictly forbidden by *Daubert* and all applicable rules of evidence. Furthermore, because Mr. Slintak's causation opinions are premised on an incorrect damage investigation, incorrect methodology for investigation of roofing systems, and assumptions, his opinions are not reliable, and this Court should exclude him from offering such opinions at trial.

For all of the foregoing reasons, Plaintiff, Centre Hill Courts Condominium Association, Inc. respectfully requests that this Honorable Court:

1. Grant Plaintiffs' *Daubert* Motion to Exclude Testimony of Defendant's Experts Andre Slintak, P.E., and Arthur Ashworth, P.E.;

2. Enter an Order prohibiting Defendant from eliciting testimony and/or introducing evidence by and through Andre Slintak, P.E. or Arthur Ashworth, P.E. as it relates to opinions on meteorological data or conditions;

3. Enter an Order prohibiting Defendant from eliciting testimony and/or introducing evidence by and through Andre Slintak, P.E., as it relates to causation opinions because his opinions are premised on an inappropriate damage investigation and incorrect methodology; and

4. Grant any and all further relief this Court deems just and proper.

Dated this 9th day of December, 2019.

                                              **MERLIN LAW GROUP, P.A.**

                                              */s/ Shane S. Smith*
                                              **WILLIAM F. MERLIN, JR., ESQUIRE**
Florida Bar Number: 364721
**ERISELDA KUHN, ESQUIRE**
Florida Bar Number: 1003031
**SHANE S. SMITH, ESQUIRE**
Florida Bar Number: 53130
MERLIN LAW GROUP, P.A.
777 S. Harbour Island Blvd., Suite 950
Tampa, Florida 33602
Telephone: (813) 229-1000
Fax: (813) 229-3692
Attorneys for Plaintiff
wmerlin@merlinlawgroup.com
ikuhn@merlinlawgroup.com
ssmith@merlinlawgroup.com
rbradley@merlinlawgroup.cm

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 9, 2019, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below by notice of electronic filing generated by CM/ECF.

By: */s/ Shane S. Smith*

## SERVICE LIST

Lauren D. Levy, Esq.
Alexander Goerss, Esq.
LEVY LAW GROUP
3399 Ponce de Leon Blvd., Suite 202
Coral Cables, Florida 33134
lauren@levylawgroup.com
alex@levylawgroup.com
lourdes@levylawgroup.com
jocelyn@levylawgroup.com
nikki@levylawgroup.com

Scott M. Rosso, Esq.
David R. Shaheen, Esq.
GED Lawyers, LLP
171 North Federal Highway
Boca Raton, Florida 33487
pdlitlaw@gedlawyers.com
dshaheen@gedlawyers.com