UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE No.: 9-19-CV-80111-BLOOM/Reinhart

CENTRE HILL COURTS
CONDOMINIUM ASSOCIATION, INC.

      Plaintiff,

vs.

ROCKHILL INSURANCE COMPANY,

      Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S DAUBERT MOTION TO PRECLUDE EXPERT TESTIMONY FROM PLAINTIFF'S DISCLOSED EXPERTS, DENNIS JAMES, STEVEN THOMAS, ROCCO CALACI AND MICHAEL BILLER, P.E., OR IN THE ALTERNATIVE FOR MOTION IN LIMINE, AND PLAINTIFF'S REQUEST FOR ORAL ARGUMENT AND EVIDENTIARY/DAUBERT HEARING

Plaintiff CENTRE HILL COURTS CONDOMINIUM ASSOCIATION, INC., by and through undersigned counsel, pursuant to Federal Rule of Evidence 702, this Court's Amended Scheduling Order dated October 22, 2019 [D.E. 58], and Local Rule 7.1, files its Response in Opposition to Defendant's Daubert Motion to Preclude Expert Testimony From Plaintiff's Disclosed Experts, Dennis James, Steven Thomas, Rocco Calaci and Michael Biller, P.E., and Request for Oral Argument and Evidentiary/Daubert Hearing, and in support thereof states:[1]

### FACTUAL AND PROCEDURAL BACKGROUND

1.      This is an action by Plaintiff, a condominium association, against Defendant for recovery of proceeds and benefits owed under Plaintiff's insurance policy for damages to its property located at 825 & 875 NW 13th Street, Boca Raton, FL 33486 (the "Property"), as a

---

[1] Plaintiff is filing separately with the Court the following Affidavits in support of this response: Affidavit of Michael Biller, P.E., Affidavit of Dennis James, Affidavit of Rocco Calaci and Affidavit of Steven M. Thomas.

result of Hurricane Irma. First Amended Complaint, [D.E. 10-1] at ¶ 1.

2.      On September 24, 2019, Plaintiff served its Expert Witness Disclosure Statement. A copy is attached as **Exhibit "A."**

3.      Plaintiff retained forensic meteorologist Rocco Calaci of LRC Services as its expert to testify regarding the weather conditions at the Property on the reported date of loss and during the relevant policy period. See Ex. A and Supplemental Expert Disclosure attached as **Exhibit "B."**

4.      Plaintiff retained Dennis James, GC of TRIAD Restoration Services as its expert to testify regarding the actual cash value of damages to Plaintiff's Property.

5.      Plaintiff retained Richard Roth, GC of Southern Restoration Services, LLC as its expert to testify regarding the replacement cost value of damages to Plaintiff's Property.

6.      Plaintiff retained Steven M. Thomas, CTS, CIT 4875, of Roof Leak Detection Company, Inc. as its expert to testify regarding Hurricane Irma damages to the flat/low slope roofing systems at the property and the appropriate repair methodology for those damages.

7.      Plaintiff retained Michael Biller, P.E. of BillerReinhart Engineering Services, Inc. as its expert to testify regarding damages due to Hurricane Irma to Plaintiff's mansard roof structures, the recommended scope of work, and that Hurricane Irma caused the damages.

8.      On October 8, 2019, Plaintiff served its Rebuttal Expert Disclosure Statement, and disclosed Steven M. Thomas, CTS, CIT 4875, Richard Roth, GC and Michael Biller, P.E. as rebuttal experts. A copy is attached as **Exhibit "C."**

9.      On December 9, 2019, Defendant filed its Daubert Motion to Preclude Expert Testimony From Plaintiff's Disclosed Experts, Dennis James, GC, Steven M. Thomas, CTS, CIT 4875, Rocco Calaci and Michael Biller, P.E.  D.E. 68.

## MEMORANDUM OF LAW

### I.     Legal Standard under Federal Rule of Evidence 702

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Federal Rule of Evidence ("F.R.E.") 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be

admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.' " *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

However, "[i]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *see also Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (citation omitted). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Furthermore, courts "must be careful not to conflate questions of *admissibility* of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Products Liab. Lit.*, No. 08-MD-01928, 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010) (quoting *Quiet Tech*, 326 F.3d at 1341) (emphasis added).

## I.      Michael Biller

### A.      Mr. Biller is Qualified to Testify Competently Regarding the Matters He Intends to Address

Mr. Biller is a Florida licensed engineer with over 29 years of experience in forensic

engineering investigations. See Affidavit of Michael Biller, P.E. ("Biller Aff") ¶3-7. Defendant's main contention is that Mr. Biller is not qualified to render opinions in the matter regarding the damage to the mansard roof structures because he did not visit the Property until two years after Hurricane Irma. D.E. 68 at 6. Typically, a forensic expert does not visit a property until a significant period of time has passed after a loss has occurred. Whether Mr. Biller looked at the pre-loss condition of the Property has no bearing on the repair methodology and only goes to causation. Mr. Biller does not disagree with Defendant's expert, Madsen Kneppers & Associates, Inc. regarding the causation of damages to the mansard roof structures, only the methodology of whether the mansard siding and waterproofing should be repaired or replaced. Biller Aff. ¶¶14, 15.

Defendant also contends Mr. Biller's testimony should be excluded because "a key issue in this action was replaced and other damage (i.e. damage to the interior drywall, carpet, furniture and fixtures) was removed." D.E. 68 at 6. This statement is a red herring. Here, Plaintiff made temporary repairs to the interiors to mitigate its damages as required by the policy. Those repairs had nothing to do with the mansard roof structures, and are irrelevant for purposes of Mr. Biller's opinions.

It is noteworthy that although Mr. Biller has given approximately 500 depositions during his engineering career, he has only been subjected to one other Daubert challenge, which the court denied without the necessity of a hearing. Biller Aff. ¶16.

### B.    Mr. Biller's Methodology is Sufficiently Reliable

As to the reliability factor, Defendant contends: "Preliminarily, Mr. Biller obtained his only information concerning the pre-loss condition of the roof from a September 20, 2019, telephone call with Centre Hill condominium board president Ms. Michele Von Clausburg." D.E.

68 at 7. Defendant's assertion is misleading to the Court. Mr. Biller did not merely take the information of Ms. Von Clausburg at face value. It is typical and customary for an expert to obtain historical data as part of his or her investigation. Mr. Biller also visually inspected the Property, reviewed photographs and reviewed weather data. See Exs. 2 and 3 to Biller Aff.

Defendant also contends: "As the date of his inspection in September 2019 was nearly two years after the loss event, it was impossible for Mr. Biller to obtain any real insight into the condition or damage to the property as of the date of loss, let alone predating the loss." D.E. 68 at 9. As stated above, Mr. Biller reviewed photos that were after the date of loss. These alleged weaknesses in Mr. Biller's testimony and expert reports are not grounds for the wholesale exclusion of his opinions; instead Defendant's arguments merely attack the weight that should be given to those opinions at trial – not their admissibility. See D.E. 183 at 9, Or. Denying Def's Mot. Lim. in *St. Louis Condominium Association, Inc. v. Rockhill Insurance Company*, Case No. 1:18-cv-21365-KMW (March 11, 2019).

### C.     Mr. Biller's Testimony Will Assist the Trier of Fact

Defendant's argument that Mr. Biller's testimony will not assist the trier of fact because he does not know of the pre-loss condition of the Property is without merit. Defendant asserts:

> In short, Plaintiff claims that during Hurricane Irma, Centre Hill suffered damage to its roof, including the Mansard system, and water damage to its interior, covered under the policy. On the contrary, Rockhill and its experts, Mr. Andre Slintak, Mr. Arthur Ashworth and Mr. Andrew Peters determined that only a limited portion of damage could be attributed to Hurricane Irma. . . .

D.E. 68 at 9. This is a self-serving statement. Defendant does not allege its own experts spoke with anyone who was at the Property before Hurricane Irma. It is evident Mr. Biller conducted a more complete forensic investigation than Defendant's experts. Further, Andrew Peters, Defendant's building consultant, admitted that he was not retained to testify regarding causation

6

of damages. Deposition of Andrew Peters, D.E. 72-1 at 29:21-23. Defendant also argues that Mr. Biller testified the mansards should be replaced for "aesthetic reasons rather than out of necessity." This statement omits Mr. Biller's deposition testimony that the type of repair Defendant contends is appropriate does not take into consideration the Florida Building Code, which is a mandatory requirement. Biller Aff. ¶¶12-13; Deposition of Michael Biller, D.E. 67-1 at 99:15-101:22.

II.      **Dennis James**

A.      **Mr. James is Qualified to Testify Competently Regarding the Matters He Intends to Address**

Plaintiff designated Dennis James as its expert to testify regarding the actual cash value amount of its loss as a result of Hurricane Irma. It appears that Defendant is not attacking Mr. James' credentials as an estimator or the scope of repair work underlying Mr. James' estimate. Defendant contends Mr. James is not qualified to testify regarding "the depreciation values to be used in Plaintiff's estimate of the [replacement cost] damages at the Centre Hill property resulting from Hurricane Irma." D.E. 68 at 10. Mr. James utilized the Xactimate software to prepare an actual cash value ("ACV") estimate for the scope of repairs detailed by Richard Roth, one of Plaintiff's other experts. D.E. 66-1 at 26:25-27:17, Deposition of Dennis James ("James Depo"). Xactimate not only is widely used and accepted within the insurance industry by carriers and policyholders alike, but also is recognized by courts to be a reliable and admissible methodology. *See, e.g., Emmanuel Baptist Church v. State Farm Fire & Cas. Co.*, No. CIV-11-594-D, 2012 WL 6084497, at *3 (W.D. Okla. Dec. 6, 2012) (noting that "courts have found that Xactimate satisfies the *Daubert* requirement that the proposed expert utilize a sound methodology"); *Mason v. Tex. Farmers Ins. Co.*, 2011 WL 10845765, at *2 (denying insurer's *Daubert* motion and acknowledging that Xactimate is a "standard industry estimating tool");

*Denley v. Hartford Ins. Co. of the Midwest*, No. 07-4015, 2008 WL 2951926, at *4 (E.D. La. July 29, 2008) (unpublished opinion) ("This tool is widely recognized and used in the insurance industry to estimate damage," and "[u]sing the Xactimate as an estimate tool, this methodology meets the soundness criteria."); *Shadow Lake Mgmt. Co. v. Landmark Am. Ins. Co.*, No. 06-4357, 2008 WL 2510121, at *4 (E.D. La. June 17, 2008) ("[T]he Xactimate methodology is reliable under *Daubert* . . . .").

Instead, Defendant challenges *only* the factual data utilized by Mr. James in preparing his cost estimate with Xactimate software -- namely, that he did not inspect the property until 2 years after Hurricane Irma, that he did not review any documentation confirming the age or condition of the property and that he did not conduct any investigation to verify the age and condition of the property. D.E. 68 at 10. This issue goes to the *credibility* of the expert, not the admissibility of the expert's opinions. *See Emmanuel Baptist Church*, 2012 WL 6084497, at *3 (denying *Daubert* motion based on expert's alleged errors in data or information used by the expert in Xactimate because "where an expert applies a sound methodology but commits errors or relies on incomplete information in reaching his conclusions, '[s]uch deficiencies impact the weight of the expert's testimony rather than its admissibility.' ") (citations omitted); *see also Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) (agreeing that no *Daubert* hearing is necessary where the challenge regards the expert's conclusions arising out of the expert's methodology because this challenge "goes to [the expert's] credibility and is properly left to the jury to determine what weight, if any, to give to [the expert's] testimony.")

When such an expert challenge is raised, " 'the testimony is admissible if the 'inadequacies are known to the defendant in order to thoroughly cross-examine the witness.' " *See Emmanuel Baptist Church*, 2012 U.S. Dist. LEXIS 173154, at *13-14 (quoting *Hertz Corp.*

*v. Gaddis-Walker Electric., Inc.*, 1997 U.S. App. LEXIS 27138, 1997 WL 606800, at *4 (10th Cir. Oct. 2, 1997) (unpublished opinion). In the instant case, Defendant has identified the alleged "errors" or "inadequacies" in the data utilized by Mr. James in generating his Xactimate estimate, and Plaintiff's counsel has fair and reasonable opportunity to cross-examine him regarding same. Thus, Mr. James' testimony is admissible, and Defendant's motion should be denied.

      **B.**      **Mr. James' Methodology is Sufficiently Reliable**

Mr. James' assignment in this matter was for the ***limited*** purpose of preparing an Actual Cash Value ("ACV") estimate of damages relating to the Property caused by Hurricane Irma. James Aff. ¶20. He was specifically retained to prepare an ACV estimate of damages for the Property and apply depreciation to the Replacement Cost Value (RCV) estimate previously prepared by a Florida Certified General Contractor, Richard Roth of Southern Restoration Services, LLC. *Id.* at ¶21.

Defendant contends Mr. James solely relied upon second-hand information he obtained from the Plaintiff's property manager, rendering his opinions unreliable. D.E. 68 at 10-11. This is an inaccurate statement. Defendant omits Mr. James conducted a site inspection on September 19, 2019. D.E. 66-1 at 20:16-21:1, James Depo. Defendant is attempting to hold Mr. James to a due diligence standard that is not applicable due to the limited scope of his retention in this case. Other than his site investigation, there was no reason for Mr. James to perform any additional investigation as the scope of his assignment was limited to preparing an ACV estimate of damages based on an RCV estimate previously prepared by a Florida Certified General Contractor. James Aff. ¶23.

Defendant also conveniently omits Mr. James testified in his deposition his opinions are

also based on his "past experience."  D.E. 66-1 at 38:18-39:8; 40:5-23, James Depo.  Mr. James

has over 24 years of experience working as an insurance adjuster and has adjusted thousands of

insurance claims. James Aff. ¶12.  During his employment at Nationwide Insurance Company

from May 1995, through January 2004, he received formal Xactimate training. *Id.* at ¶14.  He has

used Xactimate estimating software in his employment since approximately 1998 or 1999. *Id.* at

¶15.

      **C.**     **Mr. James' Testimony Will Assist the Trier of Fact**

      Mr. James' assignment was essentially a mathematical calculation of determining the

appropriate depreciation values to apply to come up with an ACV estimate of damages. Mr.

James' testimony will assist the trier of fact in understanding the ACV amount of the necessary

repairs to Plaintiff's property.

      **III.**     **Rocco Calaci**

      **A.**     **Mr. Calaci is Qualified to Testify Competently Regarding the Matters He Intends to Address**

      Mr. Calaci's qualifications are set forth in detail in paragraphs 1 through 9 of his affidavit

and Curriculum Vitae filed with this Court. In support of its argument that Mr. Calaci is not

qualified to testify competently regarding the weather condition at the Plaintiff's property on the

date of loss, Defendant contends Mr. Calaci has no first-hand knowledge of what occurred at the

property during Hurricane Irma and Mr. Calaci used second-hand information from the Internet

and other various sources. D.E. 68 at 11. These statements are incorrect because Mr. Calaci

states on page 3 of his report:

> The data sources used in this evaluation are critical to the thorough and accurate
> analysis of data. ***All data utilized originated from NOAA and/or the National
> Weather Service (NWS).*** This data is considered 'official" because of the quality
> control and verification process employed by the NWS. Data supplied by
> organizations other than NOAA and the NWS are not considered 'official" and

10

have not been verified in accordance with Federal guidelines. Usage of un-official
data may result in inaccurate conclusions.

See Affidavit of Rocco Calaci ("Calaci Aff") ¶14. All the data Mr. Calaci used came from the
NWS with the exception of surface analysis from Plymouth State College. Calaci Aff. ¶15. The
data used by Plymouth State College to generate the surface analysis originated from the NWS.
*Id.* The Motion also states the data came from locations miles from the property. D.E. 68 at 12.
As for surface observations, this is true because the Pompano Beach airport was 8 miles away.
Calaci Aff. ¶16. This is the closest location with Federal weather measuring equipment. *Id.* This
is the case for almost anywhere because these sites are not every 0.5 miles. *Id.* Any
meteorologist would have to do the same thing to obtain surface weather conditions. *Id.*

Mr. Calaci also utilized two weather radars in his report: (1) The Terminal Doppler
Weather Radar (TDWR) from the Fort Lauderdale Airport (TFLL) and (2) NEXRAD (Coral
Gables, FL). Calaci Aff. ¶17. Both radars provide site-specific conditions for Hurricane Irma.
The NEXRAD (Coral Gables, FL) and the TDWR for the Fort Lauderdale Airport had extensive
and thorough coverage over the Property. *Id.* NEXRAD resolution is down to 1/4 of a kilometer,
resulting in radar imagery over the Property every 5 to 6 minutes. *Id.* The radars are routinely
calibrated IAW NWS standards every 6 months and there are constant quality control procedures
to ensure accurate measurements. *Id.* The radar data allowed Mr. Calaci to analyze and interpret
weather conditions affecting the property on a 5 to 6 minute cycle throughout September 10,
2017. *Id.* All this information is explained in Mr. Calaci's expert report. *Id.*

**B.  Mr. Calaci's Methodology is Sufficiently Reliable**

Defendant's Motion contains numerous inaccuracies regarding Mr. Calaci's opinions and
methodology. Defendant correctly states Mr. Calaci used radar data from Ft. Lauderdale and
Miami, however, fails to mention that the radar beam from the Ft. Lauderdale Airport was only

11

540 feet above the ground when it passed over the Plaintiff's Property. Calaci Aff. ¶18. At this
height, there is an extremely high level of confidence that weather conditions observed on radar
also impacted the ground. *Id*. Further, Defendant states Mr. Calaci "did not rely on radar and
weather data from Boca Raton Airport located less than two miles from the [Property.]" D.E. 68
at 12. On page 20 of Mr. Calaci's report he stated the Boca Raton Airport did not have radar
available on the date of loss:

> It is also important to note that the Boca Raton Airport, located less than 2 miles
> from the subject property, did not have surface observation data available for the
> time frame being investigated by this report. The equipment ceased functioning
> during the nighttime hours of September 8, 2017.

Calaci Aff. ¶19. Second, the weather data from Boca Raton stopped transmitting on the night of
September 8, 2017. *Id*. This means there was no data available from Boca Raton Airport for
September 10, 2017. *Id.*

Defendant argues Mr. Calaci "did not rely on radar and weather data from . . . Pompano
Air Park, located approximately eight miles from the [Property.]" D.E. 68 at 12. This is also
incorrect. There is no weather radar at Pompano Air Beach Park. Calaci Aff. ¶21. Mr. Calaci
states on page 20 of his report that the *surface data* was for Pompano Beach Air Park. *Id*. On
pages 21 and 22 of his report, he cites wind data from Pompano Beach Air Park. *Id.*

Defendant further contents Mr. Calaci reviewed information concerning "documented
sustained winds of between 50 and 70 miles per hour (tropical storm force winds), with select
wind gusts in the vicinity (lasting only 3 seconds). D.E. 68 at 12. Wind gusts are usually 3 to 5
seconds and may last up to 10 seconds. See Transcript of Deposition of Rocco Calaci dated
December 5, 2019 at 41:17-42:3. On page 22 of his report, Mr. Calaci cites to an Event Narrative
for Hurricane Irma from the Storm Events Database, and states, in part: "Highest measure wind
gust in the county was 91 mph at Palm Beach International Airport at 455PM EDT and at Lake

Worth Pier at 500 PM EDT." Calaci Aff. ¶22.

As for the documented wind of 91 miles per hour, Mr. Calaci also states on page 20 of his report the "footprint" of the wind measuring equipment is only 400 square feet and it is implausible to believe that the maximum wind for the area hit that precise spot. Calaci Aff. ¶23.

Page 3 of his report states the following:

> *The methodology used for this report is the same process of analysis and interpretation employed by the NWS and Department of Defense (DoD) meteorologists. I learned this analysis and interpretation procedures during my time working with the NWS and US Air Force. The methodology is still in use throughout the NWS and DoD.*

*Id.,* ¶24. Mr. Calaci's methodology is the same methodology taught by the DoD and NWS. *Id.* ¶25. His CV outlines the multiple DoD meteorology schools he has attended, where the methodology was taught. *Id.* He was also an DoD Instructor of Meteorology (1981-1984), where he taught thousands of military personnel the same methodology procedures. *Id.*

### C.     Mr. Calaci's Testimony Will Assist the Trier of Fact

Defendant asserts Mr. Calaci's testimony will not assist the trier of fact to understand weather conditions at the Property. Defendant cites the alleged opinions of its engineering expert, Andre Slintak, P.E., ***who is not a meteorologist*** and has no formal meteorological training.[2] Defendant contends Mr. Slintak reviewed Mr. Calaci's report and confirmed that based on information in his report there were no confirmed tornadoes in the vicinity of the Property. D.E. 68 at 13. Nowhere in Mr. Calaci's report does he state tornadoes affected the Property. Calaci Aff. ¶26. Mr. Calaci states there were multiple Tornadic Vortex Signatures directly over the Property on September 10, 2017. *Id.* ¶27. A Tornadic Vortex Signature is not a tornado. *Id.* The fact that there were no confirmed tornadoes reported in the area, only means

---

[2] Plaintiff filed a *Daubert* Motion to exclude the testimony of Andre Slintak, P.E. as to meteorological conditions and opinions. See D.E. 76.

that no one reported these phenomena, it doesn't mean that it didn't exist. *Id.* The reason why Mr. Calaci included this information is to explain that these embedded features may have been a factor of the weather that impacted the subject property. *Id.* This is just one way that Mr. Calaci's testimony will assist the trier of fact.

Next, Defendant argues Mr. Calaci did not identify verifiable information supporting his conclusions that the Property experienced hurricane conditions. As for hurricane conditions at the Property, the National Hurricane Center has sole authority to categorize hurricane strength. Calaci Aff. ¶28. The fact that hurricane conditions were not met at the Property does not render Mr. Calaci's opinions unreliable. Mr. Calaci used a pressure gradient analysis between Pompano Air Park and the Property to ensure data similarity between the two locations. *Id.* ¶28. Thus, Mr. Calaci was able to reach a high level of meteorological certainty that weather conditions between the two locations was accurate. *Id.* As for the radar data, the radars are good down to 1/4 of a kilometer and easily site-specific. *Id.*

IV.     **Steven Thomas**

A.     **Mr. Thomas is a Certified Roof Inspector Who Possesses the Qualifications to Render Expert Opinions Regarding Damages to Plaintiff's Roofs**

Mr. Thomas has been a professional roofing inspector for twenty-nine years. Affidavit of Steven M. Thomas ("Thomas Aff.") ¶3. During that timeframe he has personally evaluated over 20,000 roofing systems. *Id.* His assessments have included the spectrum of modified bitumen roofs, built up roofs, single ply, shingle, metals, slate, clay and concrete tiles, and sprayed foam roofing systems. *Id.* Mr. Thomas' assessments have included inspecting roofing systems to evaluate their overall condition, verify whether insulation was properly installed, find the source of leaks, assess the extent of damage, and identify the cause(s) of damage. *Id.* ¶17.

Mr. Thomas' expertise has been sought by a wide array of clients, including multiple

insurance companies. A partial list of his carrier retentions includes Lloyds of London, JM Global Insurance Company, Travelers Insurance, Scottsdale Insurance Company, Olympus Insurance Company, Citizens Insurance Company, Zurich Insurance Company, and Chubb Insurance Company. *Id*. ¶13. He is also a preferred vendor for Travelers Insurance. *Id*. ¶12.

No one wants a leaking roof and the nature of certain enterprises requires a roof condition assessment to determine if there is moisture intrusion from the roofing system. Facilities retaining Mr. Thomas' professional services include St. Mary's Hospital in West Palm Beach, Florida, Orlando Regional Medical Center, and the W.M. Keck Observatory in Hawaii. *Id*. ¶13.

In addition to his twenty-nine years of experience, Mr. Thomas has achieved a number of designations within the field of roofing assessments. He has held the designation of Certified Infrared Thermographer [#4875] since 1997. *Id*. ¶10. In 2010 he became a Certified NACHI Roof Inspector. Mr. Thomas has also been certified as a Forensic Roofing Inspector by the National Roofing Certificate and Inspection Association. *Id*. ¶4. He was certified by the Independent Adjusters and Umpires Association beginning in 2010 as a Certified Windstorm Umpire. *Id*. ¶8. Consistently since 2015 he has been certified by the Roof Consultants Institute as a Certified Uplift Testing Specialist. *Id*. ¶9. Mr. Thomas is a Certified Course Instructor for Roofing; ID# 1335788. *Id*. ¶7. He teaches classes in identifying wind and hail damage to roofing systems, assessing what is normal wear and tear, determining appropriate testing procedures, and documentation of roofing evaluations. *Id*. An important designation when considering the qualifications of Mr. Thomas is his status as a voting member of the ASTM Roofing Committee. The ASTM is one of the most widely recognized international standards organizations; more than 12,000 of its standards operate globally and are incorporated in numerous federal, state and local laws and regulations. (www.astm.org) In that capacity he has assisted in creating standards

for performing roof testing.  *Id.* ¶11.  Not only is he employed by policyholders and insurance carriers in the litigation arena as detailed in his CV, but he is also frequently retained by insurance companies to evaluate roofs for underwriting purposes.  *Id.* ¶12.  Carriers trust Mr. Thomas with doing due diligence to determine if they should even undertake insuring a risk. That employment denotes confidence in his roofing assessment skills.

Mr. Thomas was previously retained as a roofing expert on behalf of Rockhill Insurance Company in the case styled *The Cantonis Company v. Rockhill Insurance Company*, *et al* Case No. 9:18-cv-81703-RLR. *Id.* ¶16. The defense firm in the current matter, Levy Law Group, designated Mr. Thomas as a roofing expert in the *The Cantonis Company* case. *Id.* He testified at deposition in that case on behalf of Rockhill Insurance Company. *Id.*  He further performed a moisture survey in the *The Cantonis Company* case, as he did in the instant action. *Id.*

Defendant, argues, in part: "Mr. Thomas is not qualified to render opinions here because he did not visit the property until April of 2018, nearly a year after the loss event. In addition, as Mr. Thomas' opinions consist of observations and test results, the Court should classify Mr. Thomas as a fact witness, rather than as an expert." D.E. 68 at 14.  One read through of Mr. Thomas' CV exposes the absurdity of that position.  Within his field of expertise, a certified roof inspector, Mr. Thomas has 29 years of experience performing roof evaluations on commercial, industrial and residential properties. The assessments have included conducting moisture surveys, wind uplift testing. Roofing specification preparation, tile uplift testing, Solar panel installations, project management and damage assessments.

### B.    The Methodologies Utilized by Mr. Thomas in Reaching his Opinions are Reliable and in Conformity with Industry Standards

Mr. Thomas is the owner and president of Roof Leak Detection Company, Inc.  He purchased the company shortly after he began employment there in 1993. Thomas Aff. ¶5.  Roof

Leak Detection Company, Inc. is a certified roof testing laboratory. Since 1994 it has continuously been certified by Miami-Dade County as a testing laboratory to perform moisture surveys, wind uplift testing, fastener uplift testing, and tile uplift testing. *Id.* ¶6. Mr. Thomas is thoroughly familiar with testing methods and protocols. He is knowledgeable regarding what type(s) of tests are appropriate for different roofing systems. It is Mr. Thomas' professional opinion and sworn testimony that there are three types of nondestructive moisture surveys for performing a forensic analysis on flat roofs to determine the amount of trapped moisture. *Id.* ¶30. On the Centre Hill flat roofs, eligible for nondestructive testing, Mr. Thomas performed moisture testing. *Id.* ¶25-26. Mr. Thomas authored an article entitled *How to Protect Your Roofing Investment.* In that article he explains that the condition of sloped and flat roofs is evaluated differently. Mr. Thomas opines "Flat roofs, at a minimum, should have Roof Moisture Survey performed by a licensed Certified Roof Testing Company. *Id.* ¶32.

Mr. Thomas and his company, Roof Leak Detection Company, Inc., were retained on behalf of Plaintiff to perform roofing evaluations at the Property. The crux of Mr. Thomas' assignment was to ascertain whether there was damage to the roofing systems. If he made that determination, then he was to evaluate whether the damage could be repaired or should be replaced.

### C.    Mr. Thomas' Testimony Will Assist the Trier of Fact

Mr. Thomas' opinions and testimony are based upon sufficient facts and data and are the product of reliable principles and methods which have been reliably applied to the facts of this case. As such, Defendant's motion to exclude Mr. Thomas should be denied. This Court must remember that the purpose of *Daubert* is not for the court to determine any disagreement between the parties' experts, nor to judge or determine whether an expert's conclusions should be

adopted. Rather, reliability of the expert's methodology is the cornerstone of *Daubert*, a measure Steven Thomas clearly meets. His testimony and opinions will assist "the trier of fact, through the application of technical and specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) (*quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Mr. Thomas has testified at deposition in excess of seventy-five times and at trial twelve times.  Thomas Aff. ¶15. Courts on multiple occasions have therefore determined he possesses the requisite expertise to render professional opinions. In 2015, in the matter of *Eagle Point Condo Association v. Main Street America Assurance Company, et al*, Case No.2:14-CV-01707 (W.D. Pa.) he was selected by both parties to serve as their roofing expert. How rare an occurrence that opponents in litigation concur that an expert has the knowledge, reliability, and unbiased approach to be retained as their joint expert. The Honorable Arthur J. Schwab approved the stipulation. Thomas Aff. ¶18, Ex. 2.  He was tasked with determining if there was damage to the roofs of a condominium complex, ascertaining whether damage was caused by a high wind event or hail, determining the date of the damage, recommending a damage repair or replacement methodology, and providing the cost.  The sheer scope of the assignment confirms the trust placed in Mr. Thomas by both Plaintiff and Defendant. *Id.*

Mr. Thomas has been accepted as a testifying expert on twelve occasions because his opinions are reliable, his methodology appropriate, and his assessments helpful to the trier of fact.  Plaintiff requests Defendant's motion to preclude Mr. Thomas' testimony be denied.  There is a monumental difference between admissibility of testimony and weight to be given testimony. Defendant couches its motion as an admissibility argument whereas the issues it focuses on go to weight.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1, Plaintiff requests the Court allow oral argument on Defendant's Motion and schedule an evidentiary/*Daubert* hearing to allow Plaintiff's experts to testify and explain the methods they each used and the basis for using them so that they can show the Court that they are grounded established methods and procedures and that they are reliable and peer tested.

This Court should hold an evidentiary/*Daubert* hearing to resolve Defendant's motion. "Although "[i]t is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert,*" "[t]he most common method for fulfilling this function is a *Daubert* hearing[.]" *Goebel v. Denver & Rio Grande Western Railroad Co*., 215 F.3d 1083, 1087 (10th Cir. 2000). Any such hearing is necessary pursuant to the applicable law, in order for the Court to effectuate the "gate-keeper" function and to create a proper record. "[W]e have recognized that it [the Court] has no discretion to avoid performing the gatekeeper function." *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1223 (10th Cir. 2003) *citing Goebel v. Denver & Rio Grande W. R.R. Co*., 215 F.3d 1083, 1087 (10th Cir. 2000) (*citing Kumho Tire v. Carmichael*, 526 U.S. 137, 158-59 (1999)). "A natural requirement of the gatekeeper function is the creation of 'a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law.' " *Dodge, supra, citing Goebel, supra* at 1087. "In *Velarde,* we observed that '*Kumho* and *Daubert* make it clear that the [district] court must, on the record, make some kind of reliability determination." *Dodge, supra* at 1223 (emphasis in original) *citing United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir.2000). "Thus, we held in *Goebel* that when faced with a party's objection, a district court 'must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.' " *Dodge, supra* at 1223 (emphasis in original) c*iting Goebel, supra* at 1088.

While a *Daubert* hearing is not required in all situations, courts have abused their discretion by not holding them under certain circumstances. See *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999) (in ruling that the trial court abused its discretion by not holding a *Daubert* hearing, the court explained that " '[G]iven the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clear-cut cases to gauge reliability of expert proof on a truncated record." [citation omitted]); *Elcock v. Kmart Corp.,* 233 F.3d 734, 745 (3d Cir. 2000) (where a *Daubert* hearing would have permitted a fuller assessment of expert's analytical process, it was a necessary predicate for a proper determination of the expert's reliability); *Kerrigan v. Maxon Indus., Inc*., 223 F. Supp. 2d 626, 634 (E.D. Pa. 2002) (stating that *Daubert* hearing is required when record did not clearly explicate basis of proffered opinion). Other courts have also properly found that failure to hold a *Daubert* hearing is reversible error. See *Elcock v. Kmart Corp*., 233 F.3d at 745 (3d Cir. 2000) (A *Daubert* hearing "would have permitted a fuller assessment of [the expert's] analytical processes and thus was a necessary predicate for a proper determination as to the reliability of [the expert's] methods.")

Here, the Court should allow Plaintiff the opportunity to qualify its experts and demonstrate the reliability of their proposed testimony. Given the complex nature of the damages, Plaintiff should be given the opportunity to present its experts' qualifications and demonstrate the reliability of some, if not all, of their opinions in that setting. Plaintiff requests an evidentiary hearing so Messrs. Biller, James, Calaci and Thomas can explain the methodology they each employed in reaching their conclusions as well as the foundation for their opinions. **Plaintiff requests two hours for the Oral Argument. Plaintiff also requests a minimum of a full day for the Evidentiary/*Daubert* hearing should the Court not deny in its entirety Defendant's Motion after oral argument.** Should the Court deny in part Defendant's *Daubert*

Motion after oral argument, the length of time requested by Plaintiff for the Evidentiary/*Daubert* Hearing would accordingly be adjusted.

**CONCLUSION**

For the reasons explained above, Plaintiff respectfully requests Defendant's Motion to Preclude Expert Testimony From Plaintiff's Disclosed Experts, Dennis James, Steven Thomas, Rocco Calaci and Michael Biller, P.E., or in the Alternative Motion in Limine, be denied in its entirety. Further, Plaintiff requests that Plaintiff and its experts be afforded Oral Argument and an Evidentiary/ *Daubert* Hearing to fully explain the methodology utilized and answer any questions the Court may have.

Dated this 23rd day of December 2019.

**MERLIN LAW GROUP, P.A.**

*/s/ Shane S. Smith*
**WILLIAM F. MERLIN, JR., ESQUIRE**
Florida Bar Number: 364721
**ERISELDA KUHN, ESQUIRE**
Florida Bar Number: 1003031
**SHANE S. SMITH, ESQUIRE**
Florida Bar Number: 53130
MERLIN LAW GROUP, P.A.
777 S. Harbour Island Blvd., Suite 950
Tampa, Florida 33602
Telephone: (813) 229-1000
Fax: (813) 229-3692
Attorneys for Plaintiff
wmerlin@merlinlawgroup.com
ikuhn@merlinlawgroup.com
ssmith@merlinlawgroup.com
rbradley@merlinlawgroup.cm

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 23, 2019, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below by notice of electronic filing generated by CM/ECF.

By: */s/ Shane S. Smith*

## <u>SERVICE LIST</u>

Lauren D. Levy, Esq.
Alexander Goerss, Esq.
LEVY LAW GROUP
3399 Ponce de Leon Blvd., Suite 202
Coral Cables, Florida 33134
lauren@levylawgroup.com
alex@levylawgroup.com
lourdes@levylawgroup.com
jocelyn@levylawgroup.com
nikki@levylawgroup.com

Scott M. Rosso, Esq.
David R. Shaheen, Esq.
GED Lawyers, LLP
171 North Federal Highway
Boca Raton, Florida 33487
pdlitlaw@gedlawyers.com
dshaheen@gedlawyers.com