UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-80111-BLOOM/Reinhart

CENTRE HILL COURTS
CONDOMINIUM ASSOCIATION, INC.,

    Plaintiff,

v.

ROCKHILL INSURANCE COMPANY,

    Defendant.
_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendant Rockhill Insurance Company's ("Defendant") *Daubert*[1] Motion to Preclude Expert Testimony from Plaintiff's Disclosed Experts, Dennis James, Steven Thomas, Rocco Calaci, and Michael Biller, P.E., or in the Alternative for Motion *in Limine*, ECF No. [68] ("Defendant's *Daubert* Motion"), and Plaintiff Centre Hill Courts Condominium Association, Inc.'s ("Plaintiff") *Daubert* Motion to Exclude the Opinions of Defendant's Expert Witnesses Andre Slintak, P.E., and Arthur Ashworth, P.E., ECF No. [76] ("Plaintiff's *Daubert* Motion"), (collectively, the "Motions"). The Court has reviewed the Motions, the supporting and opposing submissions, all relevant exhibits, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendant's *Daubert* Motion is denied, and Plaintiff's *Daubert* Motion is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff, a condominium association, brings this action against Defendant for the recovery of proceeds and benefits allegedly owed under an insurance policy (the "Policy") issued by

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Defendant. Plaintiff seeks to recover under the Policy for damages sustained during Hurricane Irma to its property located at 825 & 875 NW 13th Street, Boca Raton, Florida 33486 (the "Property").

In the instant Motions, the parties are seeking to certain exclude expert witness and rebuttal expert testimony offered by the opposing party. Defendant's *Daubert* Motion seeks to exclude any and all expert testimony from Plaintiff's experts, Dennis James ("Mr. James"), Steven Thomas ("Mr. Thomas"), Rocco Calaci ("Mr. Calaci"), and Michael Biller ("Mr. Biller"), because their opinions fail to satisfy the requirements of Federal Rule of Evidence 702 and the *Daubert* standards. Further, Plaintiff's *Daubert* Motion moves to exclude the meteorological opinions of Defendant's experts, Arthur Ashworth ("Mr. Ashworth") and Andre Slintak ("Mr. Slintak"), and the causation opinions of Mr. Slintak. The Court will address each Motion individually below.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th

Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-cv-21089, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-cv-10052, 2009 WL 2058384, at *1 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[2]

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or

---

[2] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted all decisions of the Court of Appeals for the Fifth Circuit that were rendered prior to October 1, 1981.

potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, these factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role

of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). The district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

## III. DISCUSSION[3]

### A. Defendant's *Daubert* Motion

Defendant seeks to exclude the expert opinions and testimony of four of Plaintiff's experts: Mr. Biller, Mr. James, Mr. Calaci, and Mr. Thomas. Mr. Biller prepared an assessment of the damage to the mansard system at Plaintiff's Property. Likewise, Mr. James submitted an assessment of the actual cash value depreciation amounts claimed in Plaintiff's estimate of repair costs prepared by Southern Restoration, Plaintiff's consultant retained to determine the estimated costs to repair the damage to the Property. Mr. Calaci's expert report assessed the weather

---

[3] The Court notes that both parties failed to adequately meet and confer with each other prior to filing their respective Motions, as required by Local Rule 7.1(a)(3) and this Court's initial Scheduling Order, ECF No. [17] at 2. This alone is a sufficient basis to deny both Motions. Nevertheless, the Court will consider the Motions on the merits.

conditions at the Property on the day Hurricane Irma struck. Finally, Mr. Thomas prepared a report on the damage to the Property's roofing systems. Further, Defendant argues that, in the event this Court allows the challenged expert testimony to be introduced, it should limit such testimony to that outlined in the expert reports and depositions.

1. **Michael Biller**

Defendant moves to exclude Mr. Biller's testimony for the following reasons: (1) he is unqualified to testify about the hurricane-related wind damage to the mansard roof structures because he did not inspect the roof until two years after the loss, during which time, the repairs had been made to the Property; (2) he uses unreliable methodology because his conclusions concerning the pre-loss roof conditions are based solely on unverified, unreliable information from Plaintiff's condominium board president; and (3) his testimony is unhelpful because he lacks any credible knowledge of the pre-loss conditions of the roofs on the Property. Plaintiff, on the other hand, argues that Mr. Biller is qualified to competently testify regarding the damage to the mansard roof structures based on his inspection of the Property and his credentials and experience in conducting forensic engineering investigations, and that such testimony will assist the trier of fact in this case. Moreover, Plaintiff argues that Mr. Biller's opinions are based on his investigation of the Property, his review of photographs of the Property taken after Hurricane Irma and weather data, and the historical information as to the pre-loss condition of the Property from Plaintiff's property manager and condominium board president, which he independently verified during his visual inspection of the Property.

First, with regard to Defendant's challenge to Mr. Biller's qualifications, the Court concludes that Mr. Biller is qualified to render the opinions he intends to provide to the jury. An expert may be qualified "by knowledge, skill, experience, training, or education." *J.G.*, 2013 WL

752697, at *3 (citing *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129; Fed. R. Evid. 702). Further, "an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury." *Id.* (citing *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, at *3 (M.D. Fla. Aug. 3, 2005)); *see also Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) (explaining that once there exists "reasonable indication of qualifications," those qualifications then "become an issue for the trier of fact rather than for the court in its gate-keeping capacity").

Mr. Biller is a registered Professional Engineer in the State of Florida with 29 years of experience in, among other areas of engineering expertise, forensic engineering investigations and evaluations. ECF No. [89-1] at 1-2. His experience as an engineer includes the identification and determination of the causes and resulting structural damage to commercial and single-family residences that have been affected by hurricanes. *Id.* Over the last twenty years, Mr. Biller has provided hundreds of professional engineering opinions on hurricane damage investigations, has given approximately 500 depositions, and has testified as an expert at approximately 60 trials. *Id.* at 4; Dep. of Michael Biller 6:12-16, 24:22-25:17, ECF No. [67-1] ("Biller Dep."). Mr. Biller is also a registered roof consultant and a consultant for other waterproofing issues surrounding building envelopes. Biller Dep. 8:6-10.

Moreover, during his deposition, Mr. Biller explained how he developed his opinions that the damage to the roof structures was caused by hurricane-related wind damage. Specifically, he testified that he knew that the moisture in the roof systems had not been present long term because, during his inspection of the Property, he did not see any advanced ages of decay, such as rotting wood framing. Biller Dep. 51:16-52:2. Likewise, Mr. Biller testified that the damage observed on Plaintiff's Property was indicative of exposure to high wind loading and impact from airborne

debris during storm activity because the type of damage was most consistent with his past experience of damage due to storm events and airborne debris. Biller Dep. 54:3-21, 57:12-21. Mr. Biller also used weather data to confirm that there was a storm event capable of causing the damage he observed during his site inspection. Biller Dep. 28:17-29:8. Finally, Mr. Biller explained that he reviewed photographs of the damage that were taken soon after the storm, and that the damage he observed during his inspection was very similar to the conditions depicted in the photographs, which affirmed that such damage was not sustained during the two-year period after Hurricane Irma. Biller Dep. 77:15-24, 90:18-25. "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc.*, 280 F.R.D. at 661 (citing *Kilpatrick*, 2009 WL 2058384, at *1). Based on Mr. Biller's experience, credentials, and testimony, he satisfies the relatively low qualification threshold.

Likewise, Mr. Biller's testimony establishes that his opinions are not, as Defendant argues, based solely on the information supplied by Plaintiff's property manager and condominium board president. Instead, as detailed above, Mr. Biller reviewed photographs of the damage sustained that were taken soon after Hurricane Irma struck, together with weather data generated during the storm, and he conducted a lengthy site inspection of the Property, all of which were used to verify the historical information supplied and substantiate his ultimate opinions. Moreover, his testimony will assist the trier of fact in understanding the nature of the damage sustained and the cause of such damage. Thus, Defendant's arguments regarding Mr. Biller's consideration of the historical information provided by Plaintiff are challenges to the weight of his testimony, rather than its reliability, helpfulness, or admissibility, which must be evaluated by the jury. *See Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325 (quoting *Jones*, 861 F.2d at 662). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). Accordingly, Defendant's *Daubert* Motion is denied as it relates to Mr. Biller's expert opinions.

   **2. Dennis James**

Defendant argues that Mr. James's testimony should be excluded for the following reasons: (1) he is not qualified to testify to the correct depreciation amounts to be considered in calculating Plaintiff's damages because he briefly inspected the Property two years after the loss and did not review any documentation on the pre-loss condition of the Property; (2) his depreciation calculations are based solely on the unreliable, second-hand information from Plaintiff's property manager; and (3) his opinions will not assist the trier of fact to understand the evidence or to determine relevant facts. Plaintiff, in response, contends that Mr. James is qualified to testify regarding the depreciation values generated through the Xactimate estimating software and that his opinions were prepared in accordance with his limited assignment based on his site inspection, the information provided by Plaintiff's property manager about the age and condition of the Property, and his experience as an insurance adjuster. Moreover, Plaintiff argues that Mr. James's testimony will assist the trier of fact in understanding the actual cash value of the necessary repairs in this case.

The Court finds that Mr. James is qualified. He has 24 years of experience as an insurance adjuster and has adjusted thousands of insurance claims, he has been formally trained in using the Xactimate estimating software and has used such software during his employment for approximately twenty years, he has been deposed approximately 500 times, and he has testified as an expert at trial 51 times. Dep. of Dennis James 6:10-14, 41:2-7, ECF No. [66-1] ("James Dep."); ECF No. [90-1] at 2-3; ECF No. [90-2]. "Xactimate is a common software program used for cost

estimation in the insurance industry, and expert testimony based on the use of Xactimate has been admitted in multiple courts." *Coshap, LLC v. Ark Corp. Member Ltd.*, No. 1:16-CV-0904-SCJ, 2017 WL 9287017, at *5 (N.D. Ga. Dec. 12, 2017) (collecting cases). An "expert's experience as an insurance adjuster ma[kes] him qualified to testify on depreciation." *Finch v. Owners Ins. Co.*, No. CV 616-169, 2017 WL 6045449, at *5 (S.D. Ga. Dec. 6, 2017) (citing *Grand Reserve of Columbus, LLC v. Property-Owners Ins. Co.*, No. 4:15-CV-53 (CDL), 2017 WL 2618952, at *9 (M.D. Ga. Jan. 9, 2017)). Further, Mr. James's training, experience, and years of use of Xactimate in his profession make him qualified to testify as to his opinions. The fact that his opinion is based, in part, on information and data from other sources does not disqualify him as an expert. *See AMCO Ins. Co. v. TAF, Inc.*, No. CV 617-022, 2018 WL 4624097, at *11 (S.D. Ga. Sept. 26, 2018); *Erebia v Allstate Prop. & Cas. Ins. Co.*, No. 1:15-CV-312-MHC, 2016 WL 4435089, at *7 (N.D. Ga. July 18, 2016) (citing *Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325). Thus, Mr. James is qualified to testify regarding the depreciation values of Plaintiff's repair estimate.

Similarly, Mr. James's opinions are based on sufficiently reliable information, given the limited scope of his assignment. James Dep. 24:25-25:8. In particular, Mr. James testified that his opinions were based on the information from Plaintiff's property manager, from which he generated his own conservative estimate of the appropriate depreciation period to input into the Xactimate software, his observations during his site inspection, and his experience as an insurance adjuster. James Dep. 28:2-11, 32:10-33:21, 35:22-36:10, 39:1-8, 40:18-41:24. Thus, Defendant's challenges to Mr. James's methodology are challenges to the weight and credibility of the evidence, rather than the admissibility. *See Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325 (quoting *Jones*, 861 F.2d at 662).

Regarding Defendant's challenge to the helpfulness of Mr. James's opinion, the Court concludes that this testimony will assist the trier of fact. "The average lay person is generally unfamiliar with methods and procedures of insurance adjusters used to create an estimate." *AMCO Ins. Co.*, 2018 WL 4624097, at *11. Thus, Mr. James's testimony will assist the trier of fact in understanding the actual cash value of the estimated cost of necessary repairs to Plaintiff's Property. As such, Defendant's *Daubert* Motion as to Mr. James's expert testimony is denied.

### 3. Rocco Calaci

Next, Defendant seeks to exclude Mr. Calaci's testimony for the following reasons: (1) he is unqualified to testify as to the conditions at Plaintiff's Property on the date of loss because he was not present at the Property during Hurricane Irma and the information on storm conditions he used for his opinion came from internet sources that did not document the specific weather conditions at the Property; (2) his opinions are unreliable because they are based on internet research of weather conditions generated by radars located too far away from the Property; and (3) his opinions are unhelpful to the trier of fact because they are based on unverifiable information that is directly contradicted by Mr. Slintak's review of the same weather sources. Plaintiff, however, argues that Mr. Calaci is qualified to testify on the matters he intends to address based on his extensive experience as a meteorologist, that his methodology used in generating his opinions is the same process used by the National Weather Service ("NWS") and the Department of Defense ("DoD"), and that his testimony will assist the trier of fact understand why certain weather features may have impacted the Property.

With regard to Defendant's qualification challenges, Mr. Calaci explained that he is a professional meteorologist with 45 years of experience who has worked for the DoD and various other commercial agencies in various meteorological positions on a global scale. Dep. of Rocco

Calaci 44:17-47:12, ECF No. [87-1] ("Calaci Dep."); ECF No. [88-1] at 1-2. Further, he has over 30 years of direct experience in the analysis, tracking, and forecasting of tornadoes, hurricanes, and typhoons and he has conducted hundreds of forensic evaluations of weather events during his career. In Mr. Calaci's report, he explicitly indicates why, contrary to Defendant's arguments as to the weather data being generated from locations too far from the Property, the weather radar data used was necessary: "All data utilized originated from NOAA and/or the [NWS,] . . . [which] is considered 'official" [sic] because of the quality control and verification process employed by the NWS. Data supplied by organizations other than NOAA and the NWS . . . have not been verified in accordance with federal guidelines." ECF No. [87-4] at 3; *see also* Calaci Dep. 32:8-33:6. Accordingly, Mr. Calaci has met the minimal qualifications required. *See Clena Invs., Inc.*, 280 F.R.D. at 661 (citing *Kilpatrick*, 2009 WL 2058384, at *1).

Similarly, regarding the methodology employed in generating his opinions, Mr. Calaci's report states that "[t]he methodology used for this report is the same process of analysis and interpretation employed by the NWS and [DoD] meteorologists. I learned this analysis and interpretation procedures [sic] during my time working with the NWS and the US Air Force." ECF No. [87-4] at 3. In addition, his report also notes that the methodology employed in developing his opinion here is the methodology that is still in use throughout the NWS and DoD. *Id.* Likewise, Mr. Calaci explains why the radar and weather data suggested by Defendant was not used in making his report. *See* ECF No. [88-1] at 5-7; Calaci Dep. 69:18-74:15. The Court's gatekeeping function is to ensure that "[p]roposed [expert] testimony [is] supported by appropriate validation — i.e., 'good grounds,' based on what is known," *Daubert*, 509 U.S. at 590, which the Court concludes is satisfied here. "The identification of [alleged] flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC-8, Inc.*, 326 F.3d at

1345 (citing *Daubert*, 509 U.S. at 596). Thus, the Court concludes that Mr. Calaci's opinions are based on sufficiently reliable methodologies that are widely accepted in his field.

Finally, Defendant's helpfulness challenge also necessarily fails because it is based almost entirely on Defendant's own expert's disagreement regarding the weather conditions during Hurricane Irma, rather than the helpfulness of the expert testimony. This is not a proper *Daubert* challenge. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. Here, however, Mr. Calaci's opinion will help the trier of fact because it offers explanations for how certain weather features may have been a factor of the weather that impacted the Property, which are beyond what the parties could argue on their own. Therefore, Defendant's *Daubert* Motion challenging Mr. Calaci's expert opinions is denied.

### 4. Steven Thomas

Lastly, despite not challenging his qualifications as a certified roof inspector or the methodology employed in this case, Defendant moves to exclude Mr. Thomas's testimony for the following reasons: (1) he is unqualified to render the opinions presented because he did not visit the Property and conduct the moisture testing until April 2018 and his opinions are based on observations and test results, making him a fact witness, rather than an expert witness; (2) he cannot offer opinions regarding damages or pre-loss roof conditions because he did not review any historic information on the pre-loss condition of the Property; and (3) his opinions will not assist the trier of fact because they are only based on his visual inspection of the roofs and the moisture survey results. Plaintiff responds that Mr. Thomas has extensive experience and qualifications as a certified roof inspector and his opinions here are based on a sound, industry-wide methodology

and will assist the trier of fact to understand the nature and scope of the Hurricane Irma-related damages in this case.

First, regarding Mr. Thomas's qualifications, the Court concludes that Mr. Thomas has extensively detailed his qualifications to testify to the opinions offered. Mr. Thomas has been a professional roofing inspector since 1991 and has evaluated over 20,000 roofing systems to assess, among other things, the roof condition and the source, extent, and cause of any damages. ECF No. [92-1] at 1-3. He also teaches courses on identifying wind and hail damage to roofing systems, assessing normal wear and tear, determining appropriate testing procedures, and recording roofing evaluations. *Id.* at 2. Moreover, the roof inspection Mr. Thomas conducted included documenting the condition of the roofs, any evidence of hurricane-related damage, and other possible causes of damage (i.e., age, wear and tear, etc.), which, when coupled with the moisture survey performed, established the baseline condition of the roofing system. Dep. of Steven Thomas 76:19-78:7, ECF No. [65-1] ("Thomas Dep."). Based on his qualifications, areas of expertise, and years of experience conducting roofing system evaluations, the Court concludes that Mr. Thomas is qualified to testify as an expert on all matters he intends to address in this case.

Likewise, the Court concludes that Mr. Thomas's opinions are based upon, among other things, a site inspection and moisture survey, which are widely accepted industry tests for evaluating roofing systems, and which Defendant does not dispute. With regard to Defendant's challenge to the reliability of the opinions presented, Mr. Thomas explained that roofing assessments performed in accordance with industry standards "do not rely on or require maintenance records to be an accurate, scientific inquiry leading to an opinion within a reasonable degree of professional certainty." ECF No. [92-1] at 6. Mr. Thomas also testified that the historical information of the roofs on the Property would not have impacted his opinions in this case. Thomas

Dep. 39:9-13. Thus, Defendant's arguments regarding the lack of historical information considered in Mr. Thomas's opinion is an argument that goes to the weight of the evidence, rather than the admissibility. "On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility." *Jones*, 861 F.2d at 662.

Finally, Mr. Thomas's testimony will assist the trier of fact in understanding the Hurricane Irma-related damages to the Property's flat roofing system in particular and the necessary repairs recommended. Further, Mr. Thomas's testimony will explain to the trier of fact why certain methodologies are important for determining the damage to roofing systems. Thomas Dep. 19:9-12. Such matters are beyond the understanding of a lay person and thus are appropriately presented through expert testimony. *Edwards*, 580 F. App'x at 823 (quoting *Frazier*, 387 F.3d at 1262). Therefore, Defendant's *Daubert* Motion is denied.[4]

### B. Plaintiff's *Daubert* Motion

In Plaintiff's *Daubert* Motion, Plaintiff first seeks to exclude the meteorological opinions of Mr. Ashworth and Mr. Slintak. In addition, Plaintiff moves to exclude Mr. Slintak's opinions on causation.

#### 1. Arthur Ashworth

Plaintiff argues that Mr. Ashworth is not qualified to offer any opinions regarding meteorological data or conditions because he has no training or experience as a meteorologist and did not consult with a meteorologist in formulating any opinions on the weather conditions at the Property on the date of loss. Aside from noting that Mr. Ashworth is a licensed professional

---

[4] In its response to Defendant's *Daubert* Motion, Plaintiff requests oral argument and an evidentiary hearing on the issues raised regarding the methodology and qualifications of Plaintiff's experts. The Court, however, concludes that an evidentiary hearing is unnecessary in this case.

engineer in numerous states and that the weather-related opinions do not require any meteorological training, Defendant does not address what qualifications or experience, if any, Mr. Ashworth has in the field of meteorology. However, when a party proffers the testimony of an expert under Rule 702, it bears the burden of laying the proper foundation, and the offering party must demonstrate admissibility by a preponderance of the evidence. *See Rink*, 400 F.3d at 1291-92; *Allison*, 184 F.3d at 1306. Defendant clearly has not met its burden of demonstrating the admissibility of any meteorological opinions Mr. Ashworth intended to offer. Thus, Plaintiff's *Daubert* Motion is granted as to Mr. Ashworth's meteorological opinions.

### 2. Andre Slintak

Plaintiff also argues that Mr. Slintak is not qualified to offer any opinions regarding meteorological data because he has no training or experience as a meteorologist and did not consult with a meteorologist in formulating his rebuttal opinions on the weather conditions at the Property on the date of loss. Moreover, Plaintiff contends that Mr. Slintak's opinions regarding the cause of the damages to Plaintiff's Property are not based on reliable methodology because they are not based on any moisture survey or appropriate damage investigation. Defendant responds that Mr. Slintak is qualified to offer the limited meteorological opinions presented because he has some experience and meteorological training and because he did not perform any technical analysis beyond the scope of his expertise in developing his opinions.

With regard to his qualifications to testify as to meteorological data, the Court concludes that Mr. Slintak satisfies the "relatively low threshold" for qualification here. *J.G.*, 2013 WL 752697, at *3 (citing *Martinez*, 2005 WL 1862677, at *3). Specifically, Mr. Slintak is a licensed professional engineer with more than 15 years of experience, and he has performed consulting work on structural property damage during the course of his career. ECF No. [99-1] at 146.

Moreover, Mr. Slintak testified as to his training on hurricane and windstorm damages, specifically as it relates to his engineering practice, and he indicated that assessing the weather conditions on the date of the loss is one aspect of the methodology used in developing his opinions. Dep. of Andre Slintak 39:1-19, 96:13-21, ECF No. [99-1] ("Slintak Dep."). Likewise, Mr. Slintak testified that he took an undergraduate course in meteorology as a part of his engineering degree and that he obtained a certificate in meteorology, noting that weather data is an important aspect to consider in his expert opinion. Slintak Dep. 67:6-68:19. As explained above, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *J.G.*, 2013 WL 752697, at *3 (citing *Maiz*, 253 F.3d at 665). The Court concludes that Mr. Slintak meets the minimal qualifications necessary to render his opinions regarding the weather conditions at the Property on the date of loss, given his credentials, experience, and his use and assessment of such data in the regular course of his work.

Further, with regard to the methodology Mr. Slintak employed in developing his causation opinions, the Court is satisfied that this methodology is sufficiently reliable. Plaintiff's main objection to Mr. Slintak's methodology is the fact that his conclusions regarding causation were based solely on visual observations, and that such opinions should have been developed after performing a moisture survey on the roof. However, Mr. Slintak specifically explained his reasoning for not performing a moisture survey in this case:

> A moisture survey is -- requires a considerable amount of effort. It's not something that you go onto a roof and every roof evaluation you do is -- you don't just say let's do a moisture survey. That's not the way it works. So the moisture survey is part of a greater investigation and -- I'm not finished yet -- so the investigation would entail, as I previously testified, is that you do a visual assessment. Preferably I would like to investigate the interiors first to confirm that there are sources -- or evidence that there is moisture intrusion into the interior followed by a visual assessment at the top, and if the interior evidence supports that a moisture survey is warranted, then that would be part of our reporting to the client, Engle Martin, saying further investigation is needed, we'd like to do a moisture survey.

> So in this matter, we didn't have access to the units at the time of our original site visit, so we were restricted to a visual assessment. By the time that we did have access to the units, Mr. Thomas had already issued his report dated July 17, I believe, of 2019, and so in reviewing his report after we did have access to the -- to the units, I was able to review his information wherein he indicated that there was no moisture content under the membrane of the roof.
> . . . .
> . . . The way that I approached this project as the engineer in charge is that we would assess the interiors of the units to verify that there, in fact, was moisture-related damage and where that moisture-related damage was located, to then warrant us to go on and recommend to do moisture investigation -- a moisture survey at the surface of the roof. So those things didn't happen. And by the time we finished our assessment of the interior of the units, Mr. Thomas' report was already published.

Slintak Dep. 102:2-103:16. Similarly, in explaining the methodology used in inspecting the roofs, Mr. Slintak stated that he "would not just jump into just doing a moisture survey on any roof evaluation without being able to ascertain all of the historical or supporting evidence that would indicate that there is, in fact, moisture intrusion to the interior." Slintak Dep. 97:9-13. Because he was unable to access the interior units during his site inspection to assess the need for further investigation as to the cause of the moisture damage, Mr. Slintak chose not to perform a moisture survey on the roofs of the Property. By the time Mr. Slintak was provided access to the interior units on the Property to assess the moisture damage, he already had the benefit of Mr. Thomas's report indicating that, based on his moisture survey, there was no moisture detected underneath the roofs. Further, Mr. Slintak's report indicates that the conclusions are based on the site visits conducted, a review of meteorological data, historical aerial images of the Property, photographs taken during the inspections, and his professional experience as an engineer. ECF No. [99-1] at 154, 170; Slintak Dep. 79:2-19. Therefore, the Court concludes that Mr. Slintak's causation opinions are based on sufficiently reliable methodology. "The identification of [alleged] flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345 (citing *Daubert*, 509 U.S. at 596).

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's *Daubert* Motion to Preclude Expert Testimony from Plaintiff's Disclosed Experts, Dennis James, Steven Thomas, Rocco Calaci, and Michael Biller, P.E., or in the Alternative for Motion *in Limine*, **ECF No. [68]**, is **DENIED**.

2. Plaintiff's *Daubert* Motion to Exclude the Opinions of Defendant's Expert Witnesses Andre Slintak, P.E., and Arthur Ashworth, P.E., **ECF No. [76]**, is **GRANTED IN PART and DENIED IN PART**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 27, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record